1  WILLIAM J. GORHAM III (CA State Bar No. 151773)
   NICHOLAS J. SCARDIGLI (CA State Bar No. 249947)
2  MAYALL HURLEY
   A Professional Corporation
3  2453 Grand Canal Boulevard
   Stockton, California 95207
4  Telephone: (209) 477-3833
   Facsimile: (209) 473-4818
5  E-Mail: wgorham@mayallaw.com
           nscardigli@mayallaw.com
6
   MARK A. THIEL (CA State Bar No. 182045)
7  LAW OFFICES OF MARK A. THIEL
   3439 Brookside Rd, Suite 205
8  Stockton, CA 95219
   Telephone: (209) 951-9600
9  Facsimile: (209) 475-4951
   E-Mail: thiellaw@inreach.com
10
   Attorneys for Plaintiff James Nelson
11
                 UNITED STATES DISTRICT COURT
12
                 EASTERN DISTRICT OF CALIFORNIA
13
                     SACRAMENTO DIVISION
14

| | |
|---|---|
| 15  JAMES NELSON, an individual, | Case No.: |
| 16          Plaintiff, | COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL AND CONSTITUTIONAL RIGHTS |
| 17  vs. | |
| 18  CITY OF CITRUS HEIGHTS; CITY OF CITRUS HEIGHTS POLICE | |
| 18  DEPARTMENT; JORDAN RINEK, in his | DEMAND FOR JURY TRIAL |
| 19  individual capacity as a Citrus Heights | |
| 20  Police Officer; ERIC DIAS, in his individual capacity as a Citrus Heights Police Officer; | |
| 21  KANE KISSAM, in his individual capacity as a Citrus Heights Police Officer; | |
| 22  WILLIAM DUNNING, in his individual capacity as Citrus Heights Police Officer; | |
| 23  VALENTIN ZAZHITSKIY, in his | |
| 24  individual capacity as Citrus Heights Police Officer; JEREMY HATCHELL, in his | |
| 25  individual capacity as Citrus Heights Police Officer; JASON FRITZ, in his individual | |
| 26  capacity as a Citrus Heights Police Officer; and DOES 1-100 inclusive, | |
| 27 | |
| 28          Defendants. | |

1

### INTRODUCTION

2    JAMES NELSON ("NELSON"), now 28 years old, is, and has been since a young age,

3  diagnosed as paranoid schizophrenic. He qualifies as disabled under the ADA.  On June 23,

4  2017, as part of a "welfare check" by Citrus Heights police officers, NELSON sustained second

5  and third degree burns to over fifteen percent of his body, including his entire chest and stomach

6  region, the right side of his face, and his buttocks, in addition to failure of kidney and liver

7  function.  These injuries were inflicted when several Citrus Heights police officers pinned

8  NELSON, whose hands were already handcuffed behind his back, face down to scorching hot

9  pavement as he screamed in pain that he was burning.  NELSON nearly died from these injuries

10  and required months of immediate care at the UC Davis Medical Center.  NELSON brings this

11  action for damages under the 1964 Civil Rights Act (42 U.S.C. § 1983) for violation of rights

12  guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, Title II

13  of the Americans with Disabilities Act (42 U.S.C. § 12101, *et seq.*) ("ADA"), and applicable

14  provisions of the California State Constitution and statutes.

15

### JURISDICTION AND VENUE

16    1.    This Court has original subject matter jurisdiction over Plaintiff's claims pursuant

17  to 28 U.S.C. § 1331 because it is a civil suit arising under the Constitution and laws of the United

18  States.  This Court has supplemental jurisdiction over the pendant state law claims pursuant to 28

19  U.S.C. § 1367(a) because they are part of the same controversy between the parties.

20    2.    Venue is proper in the United States District Court for the Eastern District of

21  California under 28 U.S.C. § 1391(b) because the Defendants are located in this District, and

22  because the acts and/or omissions set forth in this Complaint occurred in this District.  Venue is

23  proper in the Sacramento Division of this District pursuant to Local Rule 120(d) because the

24  claims at issue arise out of acts and/or omissions that occurred in Sacramento County.

25  / / /

26  / / /

27  / / /

28  / / /

**PARTIES**

3.     Plaintiff JAMES NELSON is a 28 year old who has been diagnosed with paranoid schizophrenia in during his teenage years.  At the time of the events set forth herein NESLON lived with his parents in Stockton, California.

4.     Defendant CITY OF CITRUS HEIGHTS ("CITRUS HEIGHTS") is a public entity in the County of Sacramento, State of California.  CITRUS HEIGHTS is subject to suit pursuant to California Government Code § 945.

5.     Defendant CITRUS HEIGHTS POLICE DEPARTMENT ("CHPD") is a department of CITRUS HEIGHTS.  CHPD is a public entity subject to suit pursuant to California Government Code § 945.

6.     Defendant JORDAN RINEK at all times relevant to this Complaint was a police officer for the CHPD, employed by CITRUS HEIGHTS.  Defendant RINEK is sued in his individual capacity.

7.     Defendant ERIC DIAS at all times relevant to this Complaint was a police officer for the CHPD, employed by CITRUS HEIGHTS.  Defendant DIAS is sued in his individual capacity.

8.     Defendant KANE KISSAM at all times relevant to this Complaint was a police officer for the CHPD, employed by CITRUS HEIGHTS.  Defendant KISSAM is sued in his individual capacity.

9.     Defendant WILLIAM DUNNING at all times relevant to this Complaint was a police officer for the CHPD, employed by CITRUS HEIGHTS.  Defendant DUNNING is sued in his individual capacity.

10.    Defendant VALENTIN ZAZHITSKIY at all times relevant to this Complaint was a police officer for the CHPD, employed by CITRUS HEIGHTS.  Defendant ZAZHITSKIY is sued in his individual capacity.

11.    Defendant JEREMY HATCHELL at all times relevant to this Complaint was a police officer for the CHPD, employed by CITRUS HEIGHTS.  Defendant HATCHELL is sued in his individual capacity.

1    12.   Defendant JASON FRITZ at all times relevant to this Complaint was a police

2  officer for the CHPD, employed by CITRUS HEIGHTS.   Defendant FRITZ is sued in his

3  individual capacity.

4    13.   NELSON is not aware of the true names and capacities of the defendants sued

5  herein as Does 1 through 100, whether individual, corporate, associate, or otherwise, and

6  therefore sues such defendants by these fictitious names.  NELSON will amend this complaint to

7  allege their true names and capacities when ascertained.  NELSON is informed and believes, and

8  on that basis alleges, that each of the fictitiously named defendants is responsible in some

9  manner for the occurrences herein alleged and that NELSON'S injuries and damages herein

10  alleged were legally caused by such defendants.  Unless otherwise indicated, each defendant was

11  acting within the course and scope of said agency and/or employment, with the knowledge

12  and/or consent of said co-defendant.

13                              **FACTUAL ALLEGATIONS**

14    14.   At all times relevant herein, all wrongful acts and/or omissions by the Defendants

15  were performed under color of state law and/or in concert with or on behalf of those acting under

16  the color of state law.

17    15.   NELSON was diagnosed with schizophrenia during his teenage years.

18  NELSON's illness causes him to hear imaginary voices that scare him and tell him to do things.

19  NELSON's mental illness impairs his ability to function in day to day life.  At the time of the

20  events described herein, NELSON was 27 years old and living at home with his parents who

21  helped care for him.  Like many mentally ill persons, NELSON struggled with keeping

22  compliant with his prescribed medication.  When he failed to take his medication, NELSON's

23  inability to function in society in a coherent fashion became evident.

24    16.   On June 23, 2017, NELSON was off of his medication.  While driving in the City

25  of Citrus Heights, he was involved in a traffic accident at approximately 11:45 a.m. at the

26  intersection of Woodmoore Oaks and Fair Oaks.  This accident triggered a cascading series of

27  events that put NELSON in crisis mode.

28  / / /

17.     Defendants DIAS and HATCHELL were dispatched by CHPD to respond to the accident.  Defendant HATCHELL concluded NELSON caused the collision.  NELSON's car was inoperable and in need of towing.  NELSON was afraid of what would happen since he was away from his home in Stockton and his vehicle was disabled.  Defendant HATCHELL permitted NELSON to use his phone and NELSON called his parents.  NELSON spoke with his mother and expressed his anxiety about having been in an accident.  NELSON's mother told him to be calm, and to provide the police with his insurance information.

18.     While at the scene, DIAS observed NELSON acting "extremely" nervously.  NELSON was nervous about what he could do without a car or a ride.  Although Defendants DIAS and HATCHELL investigated for potential drug involvement on the part of NELSON and even had him followed by different officers as he left the scene on foot, they found no evidence that led to NELSON's arrest and he was never placed under arrest.

19.     Now without a car or a ride and on foot, and with temperatures soaring to 100° Fahrenheit, NELSON set out on foot for about 3 miles to the "Sylvan Corners" area of Citrus Heights (the intersection of Old Auburn Road and Auburn Boulevard).  NELSON's schizophrenic condition is exacerbated by hot weather.  NELSON was in crisis and began darting in and out of traffic without any particular purpose.  NELSON began to speak to imaginary persons.

20.     At about 3:00 p.m., CHPD received "several calls" regarding a man fitting the description of NELSON (black male, white shirt, white pants, camouflage cap) running in and out of traffic.  Defendant RINEK and CHPD Officer Jason Kohagen were dispatched to "Sylvan Corners" by CHPD to conduct a "welfare check" – a reference to whether the subject (NELSON) needed to be detained because the subject, due to a mental health disorder, constituted a danger to himself, to others, or was gravely disabled.  *California Welfare & Institutions Code § 5150(a)*.

21.     Upon their arrival, Defendant RINEK and Officer Kohagen concluded that NELSON was the individual who had been reported to CHPD as running in and out of traffic at "Sylvan Corners."  Defendant RINEK and Officer Kohagen observed that NELSON was now shirtless, and was obstructing traffic, acting erratically, squatting, and looking over his back.

They observed that NELSON was acting "paranoid" and "not making sense" in his communications with the officers. They issued NELSON a citation for violation of California Vehicle Code § 21955, and when they asked NELSON to sign for the ticket, NELSON attempted to sign the metal handheld machine holding the ticket, rather than the ticket itself. Concerned about NELSON's condition and because the officers were aware of the extreme heat that day, the officers obtained two bottles of water for NELSON. Defendant RINEK and Officer Kohagen then released NELSON.

22.     NELSON's paranoid behavior did not improve and he returned to running in and out of traffic at the "Sylvan Corners." CHPD received "multiple calls" describing NELSON'S erratic behavior. CHPD dispatched Defendant RINEK to perform another "welfare check" at approximately 4:05 p.m. Upon arriving, Defendant RINEK observed a now shirtless NELSON walking in a parking lot. Defendant DIAS met him at the scene. Defendant DIAS was the acting supervisor of the scene from that point forward.

23.     Defendant RINEK told Defendant DIAS that he was going to handcuff NELSON "for his safety." Defendant RINEK ordered NELSON to sit on a curb and to place his hands behind his head. NELSON complied. Defendant RINEK proceeded to handcuff NELSON'S hands behind his back.

24.     Once handcuffed, NELSON did not present a threat to the safety of any of the CHPD officers at the scene.

25.     Once handcuffed, NELSON did not present a threat to the public.

26.     After NELSON was handcuffed, Defendant RINEK knew NELSON did not present a threat to his safety, or to the safety of other persons.

27.     After NELSON was handcuffed, Defendant DIAS knew NELSON did not present a threat to his safety, or to the safety of other persons.

28.     After NELSON was handcuffed, Defendant DUNNING knew NELSON did not present a threat to his safety, or to the safety of other persons.

29.     After NELSON was handcuffed, Defendant KASSEM knew NELSON did not present a threat to his safety, or to the safety of other persons.

30.   After NELSON was handcuffed, Defendant ZAZHITSKIY knew NELSON did not present a threat to his safety, or to the safety of other persons.

31.   After NELSON was handcuffed, Defendant HATCHELL knew NELSON did not present a threat to his safety, or to the safety of other persons.

32.   After NELSON was handcuffed, Defendant FRITZ knew NELSON did not present a threat to his safety, or to the safety of other persons.

33.   Once handcuffed, NELSON'S paranoia increased. Defendant RINEK and DIAS observed NELSON become more agitated. Nonetheless, Defendant RINEK approached NELSON to take his pulse, and NELSON panicked and tried to stand.

34.   Defendant DIAS grabbed NELSON by his handcuffed arms and obtained a "controlling grip" over NELSON. Defendant DIAS and Defendant RINEK then forced NELSON to the pavement with the intention of pinning him to the hot pavement. The pavement was well in excess of the 100° ambient temperature and this was known by Defendant DIAS and NELSON.

35.   NELSON, who was already in crisis mode, was now being pressed against the extremely hot pavement, which was burning his skin. NELSON began to writhe in pain and scream. NELSON screamed that he was burning. Defendants DIAS and RINEK continued to pin NELSON to the pavement and Defendant RINEK used his knee on NELSON'S back with his full body weight of 240 pounds to maximize the force he could put on NELSON whose hands were handcuffed behind his back.

36.   Defendants KISSAM, DUNNING, HATCHELL, ZAZHITSKIY, and FRITZ then arrived at the scene and assisted in pinning NELSON to the pavement even though he was burning. The force applied by Defendants was likely to cause death or serious injury to NELSON. Only when NELSON was unresponsive and near death did the Defendants release the pressure they were placing on NELSON to pin him to the hot pavement.

37.   Defendants then sat NELSON up and left him to sustain further burns to his buttocks.

/ / /

38.     NELSON was then transported to UC Davis medical temperature with a body temperature of 108° and second and third degree burns to nearly 20% of his body because Defendants pinned him to the hot pavement for several minutes.  Upon his arrival at UC Davis Medical Center, NELSON'S Glasgow Coma Scale score was 3, the absolute minimum score, indicating no eye movement, no response to verbal cueing, and no motor responsiveness. NELSON'S lack of responsiveness required resuscitation and intubation to allow for mechanized breathing.  NELSON required over two months of care at UC Davis Medical Center.

39.     The life-threatening injuries NELSON sustained because of the conduct of Defendants, and each of them, includes: heat stroke; encephalopathy secondary to heat stroke; respiratory failure; rhabdomyolysis; acute kidney failure; second and third degree burns to approximately 20 percent of his body; and shock.  NELSON also sustained permanent and ongoing injuries, disfigurement, pain and suffering, emotional shock and severe emotional distress, economic loss, medical expenses, and loss of earning capacity because of the conduct of Defendants, and each of them.

40.     Defendants RINEK, DIAS, KISSAM, DUNNING, HATCHELL, ZAZHITSKIY, and FRITZ, have not been trained to understand, assess, and respond, without lethal force, to the types of irrational behavior exhibited by mentally ill persons such as NELSON.  This training, which is the standard of care implemented widely throughout this nation and in Northern California and consistent with Peace Officer Standards and Training, (1) prepares officers to understand and accommodate the apparent irrationality of mentally ill persons and to gain compliance without implementing lethal force; (2) equips officers to evaluate the level of threat presented by irrational, mentally ill persons like NELSON; (3) mandates the use of specialized techniques to curb the irrational behavior and responses by mentally ill persons like NELSON; (4) mandates calling for backup and allowing for a cooling off period before engaging in tactics that lead to the use of lethal force.

41.     The specific techniques include (1) maintaining distance from mentally ill subjects to avoid escalation of conflict; (2) engaging in non-threatening communication; (3) managing the contact with mentally ill persons; (4) calling persons who are skilled with crisis

1   intervention to the scene; (5) being prepared with non-lethal means of force before engaging with

2   subjects suspected to be mentally ill; (6) taking subjects to the ground in a safe area.

3        42.   Because Defendants RINEK, DIAS, KISSAM, DUNNING, HATCHELL,

4   ZAZHITSKIY, and FRITZ were inadequately trained in such techniques, they unnecessarily

5   escalated their interaction with NELSON into a situation in which they deployed excessive,

6   lethal force, as described above.

7        43.   In performing the acts and/or omissions set forth herein, Defendants RINEK,

8   DIAS, KISSAM, DUNNING, HATCHELL, ZAZHITSKIY, and FRITZ, were acting with a

9   malicious and despicable intent to cause serious physical injury to NELSON, or with a deliberate

10   indifference as to whether he would suffered serious physical injury as a result of their acts

11   and/or omissions.  Defendants RINEK, DIAS, KISSAM, DUNNING, HATCHELL,

12   ZAZHITSKIY, and FRITZ, also acted with the knowledge that their acts and omissions were in

13   violation of the established federally protected rights.

14        44.   On or about December 21, 2017, NELSON timely presented a Government

15   Claims Act claim to CITRUS HEIGHTS.  A copy of the claim is attached as Exhibit 1 to this

16   Complaint and is incorporated by this reference.

17        45.   CITRUS HEIGHTS rejected NELSON's claim by failure to act on NELSON'S

18   claim within 45 days.

19        46.   NELSON has complied with the California Government Claims Act

20   prerequisites for his state law claims herein.

**FIRST CLAIM**
**Excessive Force (4th & 14th Amendments; 42 U.S.C. § 1983)**
**(Against Defendants RINEK, DIAS, KISSAM, DUNNING, HATCHELL, ZAZHITSKIY, FRITZ, and DOES 1-90)**

24        47.   Plaintiff NELSON realleges and incorporates the allegations of Paragraphs 1

25   through 46, to the extent relevant and not in conflict with this claim, as though fully set forth in

26   this claim.

27        48.   The Fourth and the Fourteenth Amendments prohibit the use of excessive force to

28   effectuate the seizure of a person.

1     49.     Defendants RINEK and DIAS were not investigating a crime when they

2 encountered NELSON; they were dispatched for the purpose of conducting a "welfare check."

3 Defendants RINEK and DIAS handcuffed NELSON and, to the extent he had presented a danger

4 to them or the public, he no longer constituted a threat at that time. It was, from that point

5 forward, objectively unreasonable for Defendants RINEK, DIAS, KISSAM, DUNNING,

6 HATCHELL, ZAZHITSKIY, FRITZ, and DOES 1-90 to pin a shirtless and handcuffed

7 NELSON to hot pavement in order to effectuate seizure of him.

8     50.     Nevertheless, Defendants RINEK, DIAS, KISSAM, DUNNING, HATCHELL,

9 ZAZHITSKIY, FRITZ, and DOES 1-90, pinned the shirtless and handcuffed NELSON to the

10 scorching hot pavement for several minutes, notwithstanding NELSON'S pleas that he was

11 burning, until such time as NELSON was completely unresponsive. Defendants RINEK, DIAS,

12 KISSAM, DUNNING, HATCHELL, ZAZHITSKIY, FRITZ, and DOES 1-90's conduct violated

13 NELSON'S Fourth and Fourteenth Amendment rights.

14     51.     As a direct and proximate result of the conduct of Defendants RINEK, DIAS,

15 KISSAM, DUNNING, HATCHELL, ZAZHITSKIY, FRITZ, and DOES 1-90, NELSON

16 suffered injuries entitling him to receive compensatory and punitive damages against said

17 defendants.

18     WHEREFORE, Plaintiff NELSON prays for relief as set forth below.

19 **SECOND CLAIM**
**Failure to Supervise and Train (14th Amendment; 42 U.S.C. § 1983)**
20 **(Against Defendants CITRUS HEIGHTS, CHPD, and DOES 91-100)**

21     52.     Plaintiff NELSON realleges and incorporates the allegations of Paragraphs 1

22 through 51, to the extent relevant and not in conflict with this claim, as though fully set forth in

23 this claim.

24     53.     Defendants CITRUS HEIGHTS, CHPD, and DOES 91-100 acquiesced in and/or

25 were indifferent to the deficient training, supervision, and/or discipline of its police officers'

26 contacts with persons suffering from mental illness as set forth above. The maintenance of

27 deficient supervision and training disregarded the known and/or obvious consequence that the

28

1   omission would cause one or more of their police officers to violate the constitutional rights of

2   persons suffering from mental illness that its police officers came into contact with.

3       54.    By failing to supervise and train their police officers how to properly interact with

4   mentally ill persons, particularly for purposes of conducting "welfare checks," Defendants

5   CITRUS HEIGHTS, CHPD, and DOES 91-100 were deliberately indifferent to the rights of

6   mentally ill persons with whom they interacted.  This failure to adequately supervise and train

7   police officers led to the application of lethal force to NELSON during a "welfare check," while

8   NELSON was handcuffed and did not present a threat to the safety of the officers or to the

9   public.  Had their police officers received adequate training and supervision, NELSON would

10   not have been physically injured because the officers would not have exacerbated NELSON'S

11   paranoia, causing him to panic when they grabbed him while he was handcuffed.

12       55.    As a direct and proximate result of the Defendants CITRUS HEIGHTS, CHPD,

13   and DOES 91-100's actions and omissions, NELSON suffered injuries entitling him to receive

14   compensatory damages against said defendants.

15       WHEREFORE, Plaintiff NELSON prays for relief as set forth below.

16   **THIRD CLAIM**

17   **Inadequate Customs, Policies and/or Practices (14th Amendment; 42 U.S.C. § 1983)**
**(Against Defendants CITRUS HEIGHTS, CHPD, and DOES 91-100)**

18

19       56.    Plaintiff NELSON realleges and incorporates the allegations of Paragraphs 1

20   through 55, to the extent relevant and not in conflict with this claim, as though fully set forth in

21   this claim.

22       57.    Defendants CITRUS HEIGHTS, CHPD, and DOES 91-100 knew they were,

23   before the injuries caused to NELSON, dutybound to enact practices and procedures that permit

24   its officers to interact effectively with mentally ill persons, who it knew do not respond to

25   interaction with police officers as do mentally healthy persons.  The State of California

26   Commission on Peace Officer Standards and Training is mandated to provide training on the

27   handling of persons with mental illness. *See, e.g., Cal. Penal Code § 13159.2.*

28   / / /

58.     Nevertheless, Defendants CITRUS HEIGHTS, CHPD, and DOES 91-100 have not enacted adequate customs, policies, and practices for interacting with the mentally ill and have acted with a deliberate indifference towards the rights of the mentally ill.  As such, this failure by Defendants CITRUS HEIGHTS, CHPD, and DOES 91-100, was the moving force behind the faulty tactics deployed by their police officers when NELSON was handcuffed as set forth herein, resulting said police officers provoking panic in NELSON and leading to said defendants pinning the shirtless NELSON to hot pavement, causing massive injuries to him.

59.     As a direct and proximate result of the Defendants CITRUS HEIGHTS, CHPD, and DOES 91-100's actions and omissions, NELSON suffered injuries entitling him to receive compensatory damages against said defendants.

WHEREFORE, Plaintiff NELSON prays for relief as set forth below.

## FOURTH CLAIM
### Negligence; California Government Code §§ 820(a) & 815.2
### (Against All Defendants)

60.     Plaintiff NELSON realleges and incorporates the allegations of Paragraphs 1 through 59, to the extent relevant and not in conflict with this claim, as though fully set forth in this claim.

61.     California Government Code § 820(a) provides that a public entity is liable for injury caused by his act or omission to the same extent a private person is liable.  Accordingly, Defendants RINEK, DIAS, KISSAM, DUNNING, HATCHELL, ZAZHITSKIY, FRITZ, and DOES 1-90 are liable for their acts or omissions to the same extent a private person would be liable for committing the same acts or omissions.

62.     California Government Code § 815(a) provides that a public entity is liable for the acts of its employees performed in the course and scope of their employment with the public entity.

63.     Defendants RINEK, DIAS, KISSAM, DUNNING, HATCHELL, ZAZHITSKIY, FRITZ, and DOES 1-90 owed a duty of care to act reasonably when they were detaining NELSON.

64.   Nevertheless, while acting in the course and scope of their employment with Defendants CITRUS HEIGHTS, CHPD, and DOES 91-100, Defendants RINEK, DIAS, KISSAM, DUNNING, HATCHELL, ZAZHITSKIY, FRITZ, and DOES 1-90 breached the duty of care owed to NELSON through their unreasonable acts and/or omissions as set forth above including, without limitation, pinning the shirtless and handcuffed NELSON to hot pavement, causing serious and permanent injuries to his person.

65.   As a direct and proximate result of the conduct of Defendants RINEK, DIAS, KISSAM, DUNNING, HATCHELL, ZAZHITSKIY, FRITZ, and DOES 1-90, NELSON suffered injuries entitling him to receive compensatory and punitive damages against said defendants, and compensatory damages against Defendants CITRUS HEIGHTS, CHPD and Does 91-100.

WHEREFORE, Plaintiff NELSON prays for relief as set forth below.

### FIFTH CLAIM
**Failure to Reasonably Accommodate Disability; ADA, 42 § 12101, *et seq*.**
**(Against Defendants CITRUS HEIGHTS, CHPD, and DOES 91-100)**

66.   Plaintiff NELSON realleges and incorporates the allegations of Paragraphs 1 through 65, to the extent relevant and not in conflict with this claim, as though fully set forth in this claim.

67.   Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Title II of the ADA applies to arrests. *Sheehan v. City & County of San Francisco* 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part, cert. dismissed in part sub nom. Sheehan v. City & County of San Francisco* 135 S.Ct. 1765 (2015).

68.   NELSON qualifies as disabled because of his diagnosis of paranoid schizophrenia.

69.   Defendants CITRUS HEIGHTS, CHPD, and DOES 91-100 were aware of NELSON was mentally ill due to complaints it had received that he was running in and out of

traffic and its two interactions it had with him to which its police officers were dispatched to perform "welfare checks" of NELSON'S behavior and status.

70.     Upon handcuffing NELSON, Defendants CITRUS HEIGHTS, CHPD, and DOES 91-100 could have reasonably accommodated NELSON'S disability by not invading his space, or by placing him in the back of their squad car to permit him to cool down and for time to pass to reduce the stressors that were placing him in crisis.  Such accommodations would have prevented the grave injuries sustained by NELSON. Instead, Defendants CITRUS HEIGHTS, CHPD, and DOES 91-100 invaded NELSON'S space while he was handcuffed, causing him to panic. Defendants CITRUS HEIGHTS, CHPD, and DOES 91-100 then gained compliance over NELSON by pinning the shirtless and handcuffed NELSON to hot pavement, causing serious and permanent injuries to his person.  In so doing, Defendants CITRUS HEIGHTS, CHPD, and DOES 91-100 failed to reasonably accommodate NELSON in violation of the ADA.

71.     As a direct and proximate result of the Defendants CITRUS HEIGHTS, CHPD, and DOES 91-100's actions and omissions, NELSON suffered injuries entitling him to receive compensatory damages against said defendants.

WHEREFORE, Plaintiff NELSON prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays judgment from this Court as follows:

1.     For compensatory, economic (special) and non-economic (general) damages, in an amount according to proof;

2.     For punitive and/or exemplary damages Defendants RINEK, DIAS, KISSAM, DUNNING, HATCHELL, ZAZHITSKIY, FRITZ, and DOES 1-90 only;

3.     For statutory attorneys' fees and costs, pursuant to 42 U.S.C. § 1988; 42 U.S.C. § 12205; California Code of Civil Procedure § 1021.5, and any other applicable statutes;

4.     For costs of suit; and

5.     For such other and further relief as the court deems just and proper.

1

**JURY TRIAL DEMAND**

2

Plaintiff JAMES NELSON demands trial by jury as to each of his claims.

3

4

**DATED:** March 8, 2018                                    **MAYALL HURLEY P.C.**

5

6

By_____

7

WILLIAM J. GORHAM III
NICHOLAS J. SCARDIGLI

8

Attorneys for Plaintiff JAMES NELSON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT; DEMAND FOR JURY TRIAL
Page 15 of 15